UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

---------------------------------------------------------------------x

COMMUNITY VISITING NURSE AND HOME    :
CARE AGENCY, INC.; MED-CENTER HOME    :
HEALTH CARE, INC.; PRIORITY CARE, INC.;    :
STAFF BUILDERS HOME HEALTH CARE, INC.    :
and OTHER SIMILARLY SITUATED HOME    :
HEALTH AGENCIES,    :
    :
    :
    Plaintiffs and Intervenors,    :    Civil Action No.
    :    3:00 CV-1312 (CFD)
    :
    :    PLAINTIFFS-
    :    INTERVENORS'
    :    STATEMENT PURSUANT
PATRICIA WILSON-COKER, Commissioner of Social    :    TO LOCAL RULE 9(c)1
Services, and CONNECTICUT STATE DEPARTMENT    :
OF SOCIAL SERVICES; and ELLEN JOHNSON,    :
IRMA YOXALL, and JESSIE VEREEN, on behalf    :
of themselves and all others similarly situated,    :
    :
    Plaintiffs,    :
    :
    :
    v.    :
    :
    :
TOMMY THOMPSON, Secretary, United States    :
Department of Health and Human Services; and    :
THOMAS A. SCULLY, Administrator, Centers for    :
Medicare & Medicaid Services,    :
    :
    Defendants,    :
    :
ASSOCIATED HOSPITAL SERVICE; and    :
UNITED GOVERNMENT SERVICES, INC.,    :
    :
    Additional Defendants.    :

---------------------------------------------------------------------x

       Pursuant to Local Rule 9(c)1 of the Local Rules of the United States District Court for the

District of Connecticut, Plaintiff-Intervenor Med-Center Home Health care, Inc. by and through

its attorneys Arent Fox PLLC, sets forth that the following material facts are not in dispute.  For

the Court's convenience, certain statements are legal in nature and supplied in this statement so that the Court can readily discern the context in which the facts apply to the case.

## Jurisdiction and Venue

1.      This action arises under Title XVIII of the Social Security Act, 42 U.S.C. § 1395, et seq. (the "Medicare statute") and Title XIX of the Social Security Act, 42 U.S.C. § 1396, et seq. (the "Medicaid statute"). (Amended Intervenor Complaint ¶ 7).

2.      This Court has subject matter jurisdiction over Defendants Tommy Thompson, Secretary, United States Department of Health and Human Services, Thomas A. Scully, Administrator, Centers for Medicare and Medicaid Services, Associated Hospital Service, and United Government Services, Inc. (collectively the "Federal Defendants") under 28 U.S.C. § 1361 and 42 U.S.C. § 405(g). (Amended Intervenor Complaint ¶ 7).

3.      Venue lies in the United States District Court, District of Connecticut under 42 U.S.C. § 405(g), Social Security Act ("SSA") § 205(g) and 28 U.S.C. § 1391, as it is the place of business of all of the plaintiffs. (Amended Intervenor Complaint ¶ 9).

## Parties

4.      Plaintiff-Intervenor Community Visiting Nurse and Home Care Agency, Inc. ("Community) was a home health agency organized under Connecticut law as a for-profit corporation from 1971 to 2000 when it closed because of the impact of the assessed Medicaid overpayments. (Amended Intervenor Complaint ¶ 10).

5.      Community is now in bankruptcy, but at all times herein relevant, its principal office was located in West Hartford, Connecticut. (Amended Intervenor Complaint ¶ 10).

6.      Community was certified and had a valid provider agreement with the Secretary of Health and Human Services to provide home health services to eligible Medicare beneficiaries, and with the Commissioner of the Connecticut Department of Social Services to

provide home health services to eligible Medicaid recipients. (Amended Intervenor Complaint ¶ 10).

7.      Plaintiff-Intervenor Med-Center Home Health Care, Inc. ("Med-Center") was a home health agency organized under Connecticut law as a not for-profit corporation from 1995 to 1999 when it closed because of the impact of the assessed Medicaid overpayments. (Amended Intervenor Complaint ¶ 11.

8.      Med-Center had been in existence since March 31, 1986, but at all relevant times herein, its principal office was located in Brookfield, Connecticut. (Amended Intervenor Complaint ¶ 11).

9.      Med-Center was certified and had a valid provider agreement with the Secretary of Health and Human Services to provide home health services to eligible Medicare beneficiaries, and with the Commissioner of the Connecticut Department of Social Services to provide home health services to eligible Medicaid recipients. (Amended Intervenor Complaint ¶ 11).

10.      In the original pleadings, relief also was sought by plaintiff-intervenor Priority Care, Inc. ("Priority"), formerly Home Health Support Services, Inc., a home health agency organized under Connecticut law as a for-profit corporation, and has been in existence since 1983. (Amended Intervenor Complaint ¶ 12).

11.      Priority was certified and had a valid provider agreement with the Secretary of Health and Human Services to provide home health services to eligible Medicare beneficiaries, and with the Commissioner of the Connecticut Department of Social Services to provide home health services to eligible Medicaid recipients. (Amended Intervenor Complaint ¶ 12).

12.    In the original pleadings, relief also was sought by plaintiff-intervenor Staff Builders Home Health Care, Inc. ("Staff Builders"), a home health agency organized under Delaware law as a for-profit corporation.  Its principal office is located in Lake Success, New York.  (Amended Intervenor Complaint ¶ 13).

13.    Staff Builders was certified and had a valid provider agreement with the Secretary of Health and Human Services to provide home health services to eligible Medicare beneficiaries, and with the Commissioner of the Connecticut Department of Social Services to provide home health services to eligible Medicaid recipients.  (Amended Intervenor Complaint ¶ 13).

14.    Connecticut Department of Social Services ("CT DSS") is the single state agency authorized to administer the CT Medicaid program pursuant to its State Plan requirements.  (42 U.S.C. § 1396a, SSA § 1902).  (Amended Intervenor Complaint ¶ 15).

15.    Defendant Tommy Thompson, the Secretary of Health and Human Services ("Secretary"), is the federal officer charged with administering the Medicare program and overseeing the Medicaid program.  (Amended Intervenor Complaint ¶ 16).

16.    The Centers for Medicare and Medicaid Services ("CMS") was formerly known as the Health Care Financing Administration ("HCFA"), and is the agency within the U.S. Department of Health and Human Services ("HHS") that administers the Medicare program and oversees the Medicaid program.  (Amended Intervenor Complaint ¶17).

17.    Defendant Associated Hospital Service ("AHS") is a Medicare home health fiscal intermediary, pursuant to its contract with the Secretary as authorized under 42 U.S.C. § 1395h, SSA § 1816.  (Amended Intervenor Complaint ¶ 18).

18.     Under its contract with the Secretary, AHS is obligated to perform all of the obligations set out in 42 C.F.R. §§ 421.1 - 421.128.  (Amended Intervenor Complaint ¶ 18).

19.     Defendant United Government Services, Inc. ("UGS") is a Medicare home health fiscal intermediary, pursuant to its contract with the Secretary as authorized under 42 U.S.C. § 1395h, SSA § 1816.  (Amended Intervenor Complaint ¶ 19).

20.     Under its contract with the Secretary, UGS is obligated to perform all of the obligations set out in 42 C.F.R. §§ 421.1 - 421.128.  (Amended Intervenor Complaint ¶ 19).

### The Medicare Program

21.     The Medicare program, found in Title XVIII of the Social Security Act, provides insurance coverage to qualified beneficiaries for certain medical expenses, including home health benefits.  (42 U.S.C. §§ 1395 - 1395gg, SSA § 1815-1896).

22.     Part A of the Medicare program provides benefits for hospital care, skilled nursing care, hospice care, and home health care.  Some home health services are also covered under Part B of the Medicare program. (42 U.S.C. §§ 1395c to 1395i - 5).

23.     Part A of the Medicare program is completely funded by the federal government and is administered by the Secretary; administrative functions are performed under contract for the Secretary.  (Amended Intervenor Complaint ¶ 22).

24.     In Part A of the program, these contractors are known as fiscal intermediaries. (Amended Intervenor Complaint ¶ 23).

25.     The fiscal intermediary acts as the Secretary's agent.  (42 C.F.R. §§ 421.100 - 421.128).

26.     Part C of the Medicare program provides for the delivery of Part A and Part B services through managed care entities approved by the Secretary of Health and Human Services. (42 U.S.C. §§ 1395w-21 - 1395w-28, SSA § 1851-1859).

27.    The services furnished under Part C may include home health services.  (42 U.S.C. §§ 1395w-21 - 1395w-28, SSA § 1851-1859).

28.    As part of the Medicare program, Congress delegated to the Secretary of Health and Human Services the authority to promulgate any regulations that may be necessary to carry out the administration of the program.  (42 U.S.C. § 1395hh, SSA § 1871).

29.    These regulations have the force of law and are binding on all components of the Department of Health and Human Services, including all fiscal intermediaries and carriers.  (42 U.S.C. § 1395hh, SSA § 1871).

### Medicare Claims and Home Health Coverage Requirements

30.    The claims at issue cover the time period from October 1, 1988 through September 30, 1997.  (Amended Intervenor Complaint ¶ 32).

31.    During the period of October 1, 1988 through September 30, 1997, a provider of home health services to Medicare beneficiaries filed individual claims for visits with the appropriate fiscal intermediary in order to receive reimbursement under Medicare Part A.  (42 U.S.C. § 1395ff, SSA § 1869; 42 C.F.R. §§ 405.702, 409.40 - 409.41).

32.    Fiscal intermediaries review claims and make initial determinations on whether the home health services rendered are covered by the Medicare program and furnished to Medicare beneficiaries.  (42 U.S.C. §§ 1395h, 1395n(a)(2)(A), SSA §§ 1816 and 1835(a)(2)(A); 42 C.F.R. §§ 421.1 - 421.3; 421.100.23).

33.    The home health services provided by a certified home health care agency ("CHHA") to eligible Medicare beneficiaries that are covered under the Medicare program, are skilled nursing care, physical therapy, speech-language pathology services, occupational therapy, home health aide services, medical social services, durable medical equipment, medical supplies,

and under certain approved hospital teaching programs, intern and resident services. (42 U.S.C.

§ 1395x(m), SSA § 1861; 42 C.F.R. §§ 409.44 - 409.45)

34.     To qualify for Medicare coverage of home health services, a beneficiary must

meet each of the following requirements: (1) be confined to the home (homebound); (2) be under

the care of a physician; (3) be in need of skilled services on an intermittent or part-time basis; (4)

be under a physician's plan of care; and (5) the services must be provided by or under

arrangements made by a certified home health agency. (42 U.S.C. § 1395f(a)(2)(C), SSA

§ 1814(a)(2)(C); 42 C.F.R. § 409.42 - 409.43).

35.     A claim for reimbursement must be filed with the Medicare fiscal intermediary on

or before December 31 of the calendar year following the year in which the services were

furnished. (42 C.F.R. § 424.44 (a)(1)(2)).

36.     Services furnished in the last quarter of the year are deemed to be furnished in the

following year. (42 C.F.R. § 424.44 (a)(1)(2)).

37.     As a basic requirement, a claim for home health services must be included on a

UB92 form or a HCFA-1450-Uniform Institutional Provider Bill filed with the appropriate

intermediary in accordance with HCFA instructions. (42 C.F.R. § 424.32(a)(1)).

38.     The claim must be signed by the beneficiary or the beneficiary's representative,

and it must be filed within the time limits of 42 C.F.R. § 424.44. (42 C.F.R. § 424.32(a)).

39.     A written statement of an intent to claim Medicare benefits constitutes a claim if

(a) the statement is filed with HCFA or the intermediary within the time limits of 42 C.F.R.

§ 424.44; (b) identifies the specified services furnished to a named beneficiary; and (c) a claim is

filed that meets the requirements of 42 C.F.R. § 424.32(a), that is, actually filed within six

months after the month in which the intermediary advises the claimant to file the claim. (42 C.F.R. § 424.45).

40.    CT DSS and its contractor, the Center for Medicare Advocacy, filed Notices Of Intent to File Claims pursuant to 42 C.F.R. § 424.45 with reference to the claims for home health services provided during the period from October 1, 1988 through September 30, 1997. (Amended Intervenor Complaint ¶¶ 92-95).

## The Administrative Appeals Process For Denied Claims Under Medicare Part A

41.    During the time period of October 1, 1988 through September 30, 1997, after a claim is filed with the Medicare fiscal intermediary by or on behalf of the individual who received the home health services, the fiscal intermediary must determine whether or not the items and services furnished are covered by Medicare. (42 C.F.R. §§ 405.702 - 405.704.30).

42.    The fiscal intermediary issues a Notice of Initial Determination that describes whether or not the services and items are covered by Medicare. (42 C.F.R. §§ 405.702 - 405.704.30).

43.    If services and items are not covered by Medicare, the Notice of Initial Determination must describe the reasons for the denial of coverage and appeal rights. (42 C.F.R. §§ 405.702 - 405.704.30).

44.    The administrative appeal process for denials of Medicare coverage under Part A is set forth in the regulations 42 C.F.R. §§ 405.701 - 405.753.

45.    A Notice of Initial Determination is final unless a reconsideration of the fiscal intermediary's initial decision is requested by the individual, his representative, subrogee, or the provider, where the provider of services is a party to the initial determination. (42 C.F.R. §§ 405.708 - 405.710).

46.     The reconsideration of the initial determination is conducted either by the same fiscal intermediary that made the initial determination or by HCFA.  (42 C.F.R. § 405.715).

47.     A Reconsideration Determination is final unless a hearing before an administrative law judge ("ALJ") is requested by the individual, his representative, subrogee, or the provider, where the provider of services is a party to the reconsidered determination. (42 C.F.R. § 405.717).

48.     The request must be made within 60 days (65 with mailing) of receipt of the Notice of Reconsideration.  (42 C.F.R. § 405.717).

49.     An ALJ decision is final unless the individual, his representative, subrogee, or the provider, where the provider of services is a party to the administrative hearing, requests an appeal to the Departmental Appeals Board ("DAB").  (42 C.F.R. § 405.724).

50.     The request must be made within 60 days (65 with mailing) of receipt of the hearing decision.  (42 C.F.R. § 405.724).

51.     A party to a DAB decision or an ALJ decision, if the DAB does not review the ALJ decision, may obtain judicial review of that final agency decision if the amount remaining in controversy is $1,000 or more.  (42 C.F.R. § 405.730).

## The Medicaid Program

52.     Title XIX of the Social Security Act establishes a jointly funded, cooperative federal-state program known as "Medicaid."  (Amended Intervenor Complaint ¶ 41).

53.     The program is designed to "enabl[e] each State, as far as practicable under the conditions in such State," to furnish medical assistance to eligible individuals.  (42 U.S.C. § 1396, SSA § 1901).

54.     States are not required to establish a Medicaid program, but if they choose to do so they must comply with federal statutory and regulatory requirements governing the program,

including submission of a "State Plan" that fulfills all requirements imposed by the Act and by the Secretary, and compliance with minimum eligibility, coverage, and fiscal administration requirements established by the Secretary of Health and Human Services. (42 U.S.C. § 1396a, SSA § 1902).

55.     Upon approval of a State Plan by the Secretary, the state becomes entitled to receive matching funds from the federal government for a portion of its payments to providers and suppliers for furnishing medical assistance to Medicaid recipients. (42 U.S.C. § 1396b(a), SSA § 1903(a)).

56.     This federal sharing in a state's Medicaid expenditures is termed "federal financial participation" ("FFP"). (42 U.S.C. § 1396b, SSA § 1903).

57.     Under the formula set out in 42 U.S.C. § 1396b, SSA § 1903(a), Connecticut receives FFP payments equal to approximately 50% of its qualifying payments for medical and surgical services furnished to eligible recipients. (Amended Intervenor Complaint ¶ 44).

## I.     THE HISTORICAL CONTEXT OF THE DISPUTED CLAIM

### (i) State Plan Requirements Concerning Third Party Liability

58.     The Medicaid program is the payor of last resort. (42 U.S.C. § 1396a(a)(25) (A - B), SSA § 1902(a)(25)(A - B). (Nakielny Dep. pp 14-16);

59.     A State Plan must provide that the requirements of 42 C.F.R. §§ 433.138 and 433.139 are met for identifying third parties liable for payment of services under the plan and for payment of claims involving third parties. (42 C.F.R. § 433.137).

60.     For the purposes of 42 C.F.R. § 433.137, a "third party" is defined by regulation as "any individual, entity or program that is or may be liable to pay all or part of the expenditures for medical assistance furnished under a State plan." (42. C.F.R. § 433.136(3)).

61.    Liable third parties are those entities that offer full or partial payments for services included in the State Plan.  (42 CFR § 433.136(3)).

62.    Individuals who are both Medicare beneficiaries and Medicaid recipients are commonly referred to as dual eligibles.  (Letter from Timothy M. Westmoreland, Director, Center for Medicaid State Operations dated December 3, 1999).

63.    These individuals are covered by either both Part A and Part B of the Medicare program, or only by Part A of the Medicare program.

64.    Dual eligible individuals are also eligible for Medicaid benefits under their state's Medicaid program because they are indigent or medically needy.  (Letter from Judith D. Moore, Acting Director of the Medicaid Bureau dated November 19, 1996).

65.    CT DSS is the single state agency for the Medicaid program in Connecticut.  (42 U.S.C. § 1396a(a)(5), SSA § 1902(a)(5); 42 C.F.R. § 431.10).

66.    CT DSS has subrogation rights of dually eligible patients to submit claims to Medicare on their behalf, and to pursue administrative appeals of denials of Medicare coverage at each stage of the administrative exhaustion process, including reconsideration, administrative law judge hearing, appeal to the Departmental Appeals Board and judicial review of the administrative record in Federal District court.

67.    Third parties can include private insurers, commercial insurance, prepaid plans, health or casualty insurance plans, self-insured and self-funded plans, and the Medicare program, and Title XVIII of the Social Security Act.  (42 C.F.R. § 433.136).

68.    The Medicaid single state agency, here CT DSS, "must take reasonable measures to determine the legal liability of the third parties who are liable to pay for services furnished under the Plan."  (42 C. F. R. § 433.138).

69.     At a minimum, such measures include obtaining information of other health insurance, of absent or custodial parents of Medicaid recipients, exchange of state wage collection information and Social Security wage and earnings files, identification of Medicaid recipients who are treated for diagnosis and trauma codes, and identifying other liable third parties through data exchanges and the integration with the State mechanized claims processing and information retrieval system.  (42 C. F. R. § 433.138).

70.     For claims involving third party liability that are processed on or after May 12, 1986 the single state agency must follow the procedures specified in paragraphs (b) through (f) of 42 C.F.R. § 433.139.

71.     The single state agency must submit to the local HCFA Regional Office for approval "documentation of the methods (e.g., cost avoidance, pay and recover later) it uses for payment of claims involving third party liability." (42 C.F.R. § 433.139).

72.     Under the "cost avoidance" method, the probable liability of a third party is established by the single state agency at the time the claim is filed by the provider with Medicaid.  (42 C.F.R. §139).

73.     Cost avoidance requires a state Medicaid program to have procedures in place to identify any liable third party prior to Medicaid paying the claim (42 C.F.R. §433.139(b)(1); Nakielny Dep. pp. 16, 21, 22-23).

74.     The single state agency must reject the claim and return it to the provider for a determination of the amount of liability.  (42 C.F.R. § 433.139(b)(1); Nakielny Dep. p. 23).

75.     Third-party liability is established when the single state agency receives confirmation from the provider or a third party resource indicating the extent of third party liability.  (42 C.F.R. § 433.139(b)(1)).

76.    Furthermore, when the amount of liability is determined, the single state agency must then pay the claim to the extent that payment allowed under the agency's payment schedule exceeds the amount of the third party's payment. (42 C.F.R. § 433.139(b)(1)).

77.    The cost avoidance method prevents overpayment and recoupment actions against providers by State Medicaid programs based on retroactive audits of old claims previously reimbursed by Medicaid because the liable third party is identified before the claim is paid by Medicaid. (42 CFR § 433.139(b)(1)).

78.    When the probable existence of third party liability cannot be established or third party benefits are not available to pay the Medicaid recipient's medical expenses at the time the claim is filed, the single state agency must pay the full amount allowed under the agency's payment schedule. (42 C.F.R. § 433.139(c)).

79.    A State Medicaid program may request a waiver from HCFA of the cost avoidance method and pursue a "pay and recover later" policy, commonly referred to as "pay and chase." (42 C.F.R. §§ 422.138, 433.139).

80.    The waiver must be requested, evaluated and approved by HCFA before the State attempts to recover monies previously paid to providers. (42 C.F.R. § 433.139(e)).

81.    Under "pay and recover later" or "pay and chase", the single state agency pays the claim and then seeks reimbursement from a liable third party. (Letter from Judith D. Moore, Acting Director of the Medicaid Bureau dated November 19, 1996).

82.    The single state agency must seek recovery of reimbursement from the third party to the limit of legal liability within 60 days after the end of the month in which payment is made unless the agency has a waiver of the 60-day requirement. (42 C.F.R. § 433.139. 42 C.F.R. § 433.139(d)(1)).

83.    If the single state agency learns of the existence of a liable third party or benefits become available from a third party after a claim is paid, the single state agency must seek recovery of reimbursement within 60 days after the end of the month it learns of the existence of the liable third party or benefits become available. (42 C.F.R. § 433.139(a)(2)).

84.    The single state agency may request a waiver from HCFA of the 60-day deadline in which to seek recovery of reimbursement. (42 C.F.R. § 433.139(d)(2)).

85.    A single state agency may request an initial and continuing waiver of the requirements of 42 C.F.R. § 433.139 (b)(1), (d)(1) and (d)(2) if it determines that the requirement is not cost effective. (42 C.F.R. § 433.139(e)(1)).

86.    The single state agency must submit a request for waiver of the requirement in writing to the HCFA Regional Office. (42 C.F.R. § 433.139(e)(1)(i)).

87.    HCFA will review a State's request for a waiver, and if necessary, request additional information from the State. (42 C.F.R. § 433.139(e)(2)).

88.    HCFA will notify the State of its approval or disapproval determination within 30 days of receipt of a properly documented request. (42 C.F.R. § 433.139(e)(2)).

89.    The State Medicaid program is in violation of its State Plan if a single state agency has not obtained a waiver of the "cost avoidance" method and pursues a "pay and recover" or "pay and chase" method. (42 U.S.C. §§ 1396a(a)(25), SSA § 1902(a)(25); 42 U.S.C. §1396c, SSA § 1904; 42 C.F.R. § 433.139).

90.    The HCFA Administrator has the authority to take enforcement action against a State Medicaid program for failure to comply with the mandatory provisions of its State Plan. (42 U.S.C. § 1396c, SSA § 1904; 42 C.F.R. §§ 430.35; 430.60 - 430.104).

91.    CT DSS as the single state agency administering the Medicaid program in Connecticut does not have a waiver of the cost avoidance method which permits it to pursue a policy of "pay and recover later" or "pay and chase." (Email from Harold Finn, HCFA Region I to Connie A. Raffa dated December 20, 1999; Federal Defendant's Response to Plaintiffs-Intervenor's Request for Admission.)

92.    CT DSS is in violation of its state plan.  (42 C.F.R. §§ 433.135 and 433.139.)

(ii)  HCFA's Statements To State Medicaid Directors
      Reiterating Regulatory Requirements

93.    On December 3, 1999, Timothy M. Westmoreland, the Director of the Center for Medicaid and State Operations, HCFA, HHS issued a letter to the State Medicaid Directors of all 50 states to reiterate HCFA existing policies and procedures.  (Letter from Timothy M. Westmoreland, Director, Center for Medicaid State Operations dated December 3, 1999; Nakielny Dep. pp. 16, 20.

94.    The letter states in part:

[W]e want to urge States that have paid providers for Medicaid services not to recoup these payments until the extent of legal liability, if any, is established on the part of a third party (such as Medicare) to pay for the service.  Moreover, in those jurisdictions in which States, themselves, may file claims for Medicare benefits (i.e. CT, MI, NY, and VT), the regulations set forth at 42 C.F.R. § 433.139(d)(2) do not contemplate recoupment from the provider, but rather require recovery from the third party (i.e., Medicare) once liability is established. The establishment of third party liability takes place when the Medicaid agency receives confirmation from the provider or a third party resource indicating the extent of third party liability.

We are issuing this letter because (a) States are submitting an increasing number of statements of intent to file claims for Medicare benefits without the required supporting information or in an untimely manner, and (b) some States have attempted to recoup Medicaid payments from providers without establishing that Medicare (or any other third party) is liable for payment.

(Letter from Timothy M. Westmoreland, Director, Center for Medicaid State Operations dated December 3, 1999).

95.    The December 3, 1999 Westmoreland letter is based on the regulatory requirements of 42 C.F.R. § 433.139 and is not new policy.  (Id).

96.    HCFA Program Memorandum AB-99-88 was issued in December 1999 along with the December 3, 1999 Westmoreland letter.  (HCFA Program Memorandum AB-99-88 dated December 1998; Nakielny Dep. p. 16).

97.    HCFA Program Memorandum AB-99-88 is a restatement of existing HCFA policy and describes the responsibilities of fiscal intermediaries regarding written statements of intent by providers of services to file claims pursuant to 42 C.F.R. § 424.44 for the claims filing period that ended on January 3, 2000.  (Id).

98.    HCFA Program Memorandum AB-99-88 states that a statement of intent, by itself, does not constitute a claim, but rather is used as a placeholder for filing a timely and proper claim.  (Id).

99.    The Memorandum further explains that "Statements of intent must meet the requirements set forth in the regulations at 42 C.F.R. § 424.45.  The regulations require that the statement of intent must identify the beneficiary and specify the services to which the statement of intent applies.  The applicable services and dates of services must be included to identify the specific services to which the statement of intent applies.  (Id).

100.    HCFA Program Memorandum AB-99-88 instructed fiscal intermediaries that they are not responsible for identifying the provider that furnished the service, and are not responsible for requesting that the provider of the service file a claim (unless the statement of intent to file a claim was submitted by the provider of the service).  (Id).

101.    Fiscal intermediaries were further instructed that "the submitter of the statement of intent is responsible for ensuring that a proper claim is submitted within the 6-month period

following the date of your notice to the submitter of your receipt of its statement of intent.

Therefore, you may not develop a claim (i.e., if information necessary to make an initial

determination is not submitted as part of the statement of intent, you may not actively seek

information necessary to make an initial determination). . . ." (Id).

102.    HCFA Program Memorandum AB-99-88 is not limited to claims for the time

period of October 1, 1997 to December 30, 1998 and does apply to the claims in dispute in this

matter, i.e., the 1988 to 1997 period. (Id).

103.    On November 19, 1996, Judith D. Moore, Acting Director of the Medicaid

Bureau, issued a letter to the State Medicaid Directors of all 50 states, with copies to all ten

HCFA Regional Administrators and Associate Regional Administrators for Medicaid. (Letter

from Judith D. Moore, Acting Director of the Medicaid Bureau dated November 19, 1996).

104.    In the November 19, 1996 Moore letter, HCFA commented on issues as a result

of the National Dual Eligibles Initiative and review of Medicaid data supplied by states. (Id).

105.    HCFA stated with reference to the State Plan requirement to implement a "cost

avoidance" method:

> ". . . this letter is being sent as a reminder that unless HCFA has granted the State
> an approved waiver to "pay and chase" claims, the Medicaid agency must comply
> with the cost avoidance requirements of 42 C.F.R. § 433.139(b)(1). These
> requirements provide:
>
>> *If you establish the probable existence of third party liability at the
>> time the claim is filed, you must reject the claim and return it to the
>> provider for a determination of the amount of liability. The
>> establishment of third party liability takes place when you receive
>> confirmation from the provider or a third party resource indicating
>> the extent of third party liability. When the amount of liability is
>> determined, you must then pay the claim to the extent that payment
>> allowed under your payment schedule exceeds the amount of the
>> third party's payment.*
>
> In most cases involving dual eligibles, there is probable existence of Medicare
> liability. Providers should bill Medicare before Medicaid, unless it is evident that

there is no Medicare eligibility or coverage and the <u>provider furnished such confirmation to Medicaid</u>. . . .  The provider must determine whether the services furnished meet Medicare eligibility and coverage requirements."

(<u>Id</u>).

106.    The November 19, 1996 Moore letter cautioned that:

**"NOTE:  This reminder should not be interpreted as requiring providers to submit all dual eligible claims to Medicare.  Screening a claim may indicate to a provider or the State that there is no Medicare liability based on Medicare eligibility and coverage requirements and that acceptable confirmation previously submitted for similar claims may be considered precedent and again utilized."**

(<u>Id</u>.) (emphasis in original).

107.    The Moore letter also restated the criteria to qualify for Medicare home health services.

"- Services must be provided by a Medicare certified home health agency.

- The individual must need intermittent skilled nursing care or physical therapy or speech language pathology or continues to need occupational therapy by virtue of a prior need for intermittent skilled nursing care.  **The individual must also be confined to the home.**

- The individual must be under the care of a physician and receiving services under a plan of care established and periodically reviewed by a physician.

- The Medicare required physician certification and recertification for home health care must be present."

(<u>Id</u>).

104.    Pursuant to the November 19, 1996 Moore letter, if a provider determined that the claim did not meet the above Medicare criteria for coverage under the home health benefit, the provider could rely on previous precedent and not submit the claim to Medicare.  (<u>Id</u>).

108.    Plaintiffs-Intervenors submitted claims for reimbursement to the CT Medicaid program for services provided to individuals who were dually eligible for Medicare and Medicaid benefits.

109.    They submitted these claims because they believed the claims did not meet the Medicare coverage criteria.

### (iii) CT DSS' Medicare Maximization or Third Party Liability ("TPL") Project

110.    The CT DSS has contracted with The Center for Medicare Advocacy, Inc. ("CMA") to conduct the Medicare Maximization or TPL Project.  (Personal Service Agreement between The Center for Medicare Advocacy, Inc. and the Connecticut Department of Social Services).

111.    CMA is not an agency or instrumentality of the State of Connecticut.  (Amended Intervenor Complaint ¶ 87).

112.    The purpose of the Medicare Maximization or TPL Project is: (1) to identify claims paid by Medicaid that CT DSS believes are covered by Medicare; (2) to cause those claims to be submitted to Medicare for payment; and (3) to recoup any Medicaid reimbursement already paid to providers.  (Personal Service Agreement between The Center for Medicare Advocacy, Inc. and the Connecticut Department of Social Services).

113.    The contract between CT DSS and CMA requires CMA to pursue "Medicare Maximization Project Goals" including obtaining a maximum recovery of Medicaid paid services, and to obtain a timely recovery of Medicaid paid services pursuant to 42 C.F.R. § 433, [sic].  (Id.)

114.    For home health claims, CMA is compensated at the payment rate of $300 per selected patient case for all aspects of the Medicare appeal process that CMA must perform to obtain Medicare coverage.  (Id.)

115.    CT DSS first contacted the Plaintiffs-Intervenors on November 8, 1993 to inform them that CMA initiated a home health Medicare Maximization or TPL Project.  (Letter from

David S. Parrella, Chief Medical Policy / Program Implementation, CT DSS to Med Center

Home Healthcare dated November 8, 1993. (Id).

116.    This first TPL Project was for Medicaid paid claims with dates of services during

CT DSS' fiscal year of October 1, 1991 to September 30, 1992. (Letter from David S. Parrella,

Chief Medicaid Policy/Program Implementation, State of Connecticut Department of Social

Services dated November 8, 1993).

117.    The November 8, 1993 letter notified Plaintiffs-Intervenors that CMA would be

identifying claims with dates of services from October 1, 1991 to September 30, 1992 for

submission to the Medicare fiscal intermediaries, AHS and UGS, for payment. (Id.)

118.    CMA subsequently filed Notices of Intent to File Claims, pursuant to 42 C.F.R.

§ 424.45, with AHS for claims with dates of services from October 1, 1991 to September 30,

1992 that were paid by Medicaid to Plaintiffs-Intervenors. (Amended Intervenor Complaint ¶

93).

119.    Plaintiffs-Intervenors subsequently received "Medical Review Information

Requests" from their fiscal intermediary, AHS or UGS, on the claims identified by CMA in the

Notices of Intent to File Claims. (Medical Review Information Request from Associated

Hospital Service of Maine).

120.    The fiscal intermediary requested the information be submitted within six months

of the date of the request. (Id.)

121.    From 1994 to 1997, CMA continued the TPL Project by contacting and

requesting Plaintiffs-Intervenors to submit Medicaid paid claims to their fiscal intermediaries,

AHS and UGS, for dates of service provided in the following fiscal years ("FY") in the

following order:  October 1, 1992 - September 30, 1993; October 1, 1988 to September 30, 1989;

October 1, 1989 to September 30, 1990; October 1, 1990 to September 30, 1991; October 1,

1993 - September 30, 1994; October 1, 1994 to September 30, 1995; October 1, 1995 to

September 30, 1996; and October 1, 1996 to September 20, 1997. (Amended Intervenor

Complaint ¶ 95).

122.    In March 1996, Plaintiffs-Intervenors were asked to submit information on claims

dating back to FY 1988 because CT DSS had won a court decision permitting the single state

agency to be the "subrogee of such dually eligible beneficiaries." (Attachment 1 to Complaint of

The State of Connecticut Department of Income Maintenance v. Shalala, No. 2:91CV00546

(AHN) (D. Conn. Aug. 25, 1994)).

(iv)  Med Center Good Faith Efforts To Comply With Requests For Claims

123.    Med-Center made a good faith effort to submit the claims information requested.

(Affidavit of Thomas H. Fanning).

124.    Med-Center never refused to submit the claims information requested by the

fiscal intermediaries, AHS and UGS. (Id.)

125.    Med-Center's efforts to comply with TPL requests were hampered because its

billing function during the time period of the requested claims was performed by a another

organization which had since disbanded, and therefore Med-Center could not access historical

computer records. (Affidavit of Thomas A. Fanning).

126.    Additionally, Med-Center's key billing/collections manager who possessed the

historical perspective of patient accounts and related documentation necessary to respond to TPL

requests was no longer employed with Med-Center. (Id.).

127.    Med-Center relocated its operations several times during the claims period and

archived records were eventually transferred to storage in a satellite office. (Id.)

128.    Med-Center submitted the information requested by AHS and/or UGS within the six month time frame for the majority of the claims requested by the TPL Project spanning the period for dates of service covering October 1, 1988 to September 30, 1997. (Affidavit of Thomas H. Fanning).

129.    Med-Center submitted information on $1.5 million in claims representing approximately 90% of the claims requested. (Affidavit of Thomas H. Fanning).

130.    Med-Center received "Time Reject Notices" from their fiscal intermediaries, AHS or UGS, for the claims that were not submitted within the six-month time frame. (Letter from Catherine E. Jordan, Vice President , Executive Director, Datahr to Associated Hospital Services of Maine, May 20, 1997).

131.    Pursuant to the November 19, 1996 Moore letter, if a provider determined that the claim did not meet the above Medicare criteria for coverage under the home health benefit, the provider could rely on previous precedent and not submit the claim to Medicare. (Letter from Judith D. Moore, Acting Director, Medicaid Bureau dated November 19, 1996).

(v)  Appeal of Time Reject Notices

132.    Med-Center sought administrative appeals of the Time Reject Notices by requesting administrative hearings pursuant to 42 C.F.R. §§ 405.701 - 405.753. (Notice of Dismissal and Remand from Judge Bruce A. Zwecker to Med-Center).

133.    The fiscal intermediary denied these requests. (Id.)

134.    Med-Center contacted the Office of Hearings and Appeals of the Social Security Administration requesting administrative appeals of the Time Reject Notices. (Id.)

135.    Administrative Law Judge Bruce H. Zwecker reviewed the appeals of Plaintiffs-Intervenors and remanded the claims that were the basis of the Time Reject Notices to the fiscal

intermediaries, AHS and UGS for review and a decision on Medicare coverage and reimbursement. (Id.)

136.    Judge Zwecker issued numerous separate but substantially similar opinions for Med-Center. (Id.)

137.    In each opinion, Judge Zwecker stated that

> "The intermediary's 'time limit reject' notice did not state its reason for finding that the beneficiary could not be charged for the services at issue. However, a determination that the provider cannot charge the beneficiary for the services implies the findings described above, Incidentally, if the Administrative Law Judge were to make a hearing decision that did not state its reasons for deciding an issue against any party, the Medicare Appeals Council would use that fact alone as a reason to remand the case for a new hearing. When an adjudicative body does not state the reasons for determinations, another body charged with reviewing the correctness of the determination has no reasonable basis to decide whether the determination was correct.
>
> Since the determination that the provider could not charge the beneficiary for the services at issue was an initial determination, as defined in Health Care Financing Administration regulation 42 CFR § 405.704(c), the provider has a right to request a reconsideration under the provisions of Health Care Financing Administration regulations 42 CFR §§ 405.710 and 405.712. Although a party to an initial determination is expected to file a request for reconsideration within 60 days after the date of the notice of the initial determination, the notice of initial determination was defective in this case because it did not identify the determination that the provider could not charge the beneficiary for the services at issue as an initial determination and did not inform the appellant of his right to request reconsideration..."

(Id.)

138.    Judge Zwecker treated the Plaintiffs-Intervenors' request for a hearing as a request for reconsideration because of the faulty notice, stating

> "Although the request for hearing (which shall be treated as a request for reconsideration) was not filed within 60 days after the date of the notice of the initial determination, the defects in the notice of the initial determination provide the appellant with good cause for not filing a request for reconsideration within the 60 day time period."

(Id.)

139.    Judge Zwecker then held that "[t]he matter is remanded to the intermediary, which shall treat the request for hearing as a request for reconsideration, with good cause existing for its untimely filing." (Notice of Dismissal and Remand to Med-Center from Bruce H. Zwecker).

140.    Judge Zwecker's decisions became the final decision of the Secretary of Health and Human Services when HCFA did not appeal the decisions within 60 days. (42 C.F.R. § 405.717).

141.    The Federal Defendants refused to process the claims pursuant to Judge Zwecker's orders. (Letter from Paul D. Duplinsky, Manager of Administration, Medical Review and Appeals, Associated Hospital Services of Maine dated September 26, 1992).

142.    The Federal Defendants are required to comply with the ALJ decisions.

143.    In one of his decisions dated July 31, 1998, Judge Zwecker summarized the Secretary's action in refusing to allow the fiscal intermediary to review the claims as follows:

> "The position statement of the appellant's attorney indicates that the Health Care Financing Administration has ignored the findings of the Administrative Law Judge in those earlier cases. If the Health Care Financing Administration does not agree with the findings of an order of an Administrative Law Judge, its remedy is to appeal the order to the Medicare Appeals Council, otherwise known as the Departmental Appeals Board of the Department of Health and Human Services. An Administrative Law Judge of the Social Security Administration does not have the power to force the Health Care Financing Administration to follow its own rules and to respect basic principals of due process. A United States District Court would have such power, and assuming the requirements of Equal Access to Justice Act were met, the court could even compel the Health Care Financing Administration to pay the appellant's attorney for the value of his services."

(Notice of Dismissal and Remand to Middlesex Hospital Home Health Inc., from Judge Bruce H. Zwecker).

144.    CT DSS assessed overpayments against Plaintiffs-Intervenors for the claims which were the basis of the Time Reject Notices.  (Amended Intervenor Complaint ¶ 107).

145.    CT DSS has demanded that Med-Center return approximately $290,000 in Medicaid payments for home health services provided to dually eligible patients and has recouped approximately $90,000 even though third party liability pursuant to the federal regulations at 42 C.F.R. § 433.138 and 139 has never been established.  (Amended Intervenor Complaint ¶ 109).

146.    CMS has not provided a waiver to CT DSS.

147.    In the absence of waiver from CMS, providers such as Med-Center need not submit claims to CMS for processing.

148.    CMS is in breach of its obligations at law by allowing states to direct providers to submit where there is no CMS waiver.


Dated: December 22, 2002
      New York, New York

                                            Attorneys for Plaintiffs-Intervenors

                                            Connie A. Raffa, admitted *pro hac vice*
                                            David N. Wynn, admitted *pro hac vice*
                                            Eric S. Lent, admitted in New York only
                                            Arent Fox PLLC
                                            1675 Broadway, 32nd Floor
                                            New York, New York 10019
                                            (2120 484-3900